## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CHERYL LEIGH VARGAS,** | **CASE NO. 1:14-cv-02407-YK-GBC** |
| | **(JUDGE KANE)** |
| **Plaintiff,** | |
| | **MAGISTRATE JUDGE COHN** |
| **v.** | |
| | **REPORT AND** |
| **CAROLYN W. COLVIN,** | **RECOMMENDATION TO DENY** |
| **COMMISSIONER OF SOCIAL** | **PLAINTIFF'S APPEAL** |
| **SECURITY,** | |
| **Defendant.** | **Doc. 1, 9, 10, 12, 14, 15** |

## REPORT AND RECOMMENDATION

### I.    Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Defendant") denying the application of Cheryl Leigh Vargas ("Plaintiff") for supplemental security income ("SSI") and disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"), and Social Security Regulations, 20 C.F.R. §§404 *et seq.*, 416 *et seq.* (the "Regulations").[1] Plaintiff established mental and physical impairments, including cocaine and alcohol abuse. Plaintiff alleges onset in December of 2008.

---

[1] Part 404 governs DIB and Part 416 governs SSI. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Like *Sims*, these regulations "are, as relevant here, not materially different" and the Court "will therefore omit references to the latter regulations." *Id.*

Some medical evidence supports Plaintiff's claim for the first ten months after December of 2008. One state agency medical expert opined she was not disabled during this time, another state agency medical opined that she was disabled during this time.  No treating source medical opinion supports Plaintiff's claim. However, Plaintiff was hospitalized in October of 2009 during a cocaine and alcohol relapse. Her psychiatric medication was adjusted. After October of 2009, she generally denied depression and exhibited no objective psychiatric symptoms. She did not seek counseling after October of 2009 and did not seek any treatment whatsoever after May of 2010. Plaintiff does not identify any significant medical findings during her period of sobriety after October of 2009 to support her disability claim.

The ALJ reasonably relied on the medical opinion authored during Plaintiff's first period of sobriety and the dearth of subjective and objective findings during Plaintiff's second period of sobriety to conclude that, when she was sober, she did not meet the definition of disability under the Act. Even if the ALJ erred in crediting the non-examining opinion over the examining opinion authored during the period prior to October of 2009, this error was harmless. Plaintiff must establish disability for at least twelve months after December of 2008. The medical evidence after October of 2009 does not support disabling limitations. Under the deferential substantial evidence standard of review, the Court must uphold reasonable findings by the ALJ. Substantial evidence supports the ALJ's decision that Plaintiff's cocaine and alcohol use were material to her

disability and that Plaintiff did not meet the definition of disability under the Act when she was sober. For the foregoing reasons, the Court recommends that Plaintiff's appeal be denied, the decision of the Commissioner be affirmed, and the case closed.

## II.    Procedural Background

On December 30, 2008, Plaintiff filed an application for SSI and DIB under the Act. (Tr. 155-62). On July 16, 2009, the Bureau of Disability Determination denied these applications, and Plaintiff requested a hearing. (Tr. 85-96, 99-100). On July 19, 2010, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 31-84). On September 21, 2010, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 13-30). Plaintiff requested review with the Appeals Council, which the Appeals Council denied on May 18, 2012. (Tr. 634-37). On October 18, 2010, Plaintiff filed a new application for SSI, which was granted by an ALJ on October 24, 2012. (Tr. 643-53).  Plaintiff filed an action pursuant to 42 U.S.C. §405(g) to appeal the decision of the Commissioner for the December 2008 application, which the District Court granted on January 21, 2014. (Tr. 654-84). On March 19, 2014, the Appeals Council implemented the District Court's order and remanded to the ALJ for further proceedings. (Tr. 685-89). On July 28, 2014, the ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a VE appeared and testified. (Tr. 585-615). On October 8, 2014, the ALJ again found that Plaintiff was not disabled and not entitled to benefits. (Tr. 566-84).

Plaintiff did not request review with the Appeals Council. On December 17, 2014, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On August 12, 2014, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 9, 10). The Commissioner waived the requirement that Plaintiff exhaust administrative remedies. (Doc. 9, par. 3). On April 23, 2015, Plaintiff filed a brief in support of her appeal ("Pl. Brief"). (Doc. 12). On May 28, 2015, Defendant filed a brief in response ("Def. Brief"). (Doc. 14). June 8, 2015, Plaintiff filed a brief in reply ("Pl. Reply"). (Doc. 15). On June 29, 2015, the case was referred to the undersigned Magistrate Judge. The matter is now ripe for review.

### III.   Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence requires "more than a mere scintilla" but is "less than a

preponderance." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## IV.    Sequential Evaluation Process

To receive DIB or SSI, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The ALJ uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520. If the ALJ finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *Id.*  The ALJ sequentially determines: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant's impairment prevents the claimant from doing past

relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *Id.* Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). *Id.*

The ultimate burden of proving disability within the meaning of the Act lies with the claimant. See 42 U.S.C. § 423(d)(5)(A). Specifically, the Act provides that:

> An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require. An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability.

42 U.S.C. § 423(d)(5)(A); 42 U.S.C.A. § 1382c(a)(3)(H)(i).

## V.     Relevant Facts in the Record

Plaintiff was born on September 30, 1969 and was classified by the Regulations as a younger individual throughout the relevant period. (Tr. 582); 20 C.F.R. § 404.1563. Plaintiff has a GED and past relevant work as a quality control technician and a packer/inspector. (Tr. 582). Plaintiff first earned income in 1986. (Tr. 164). She earned less than $3,000.00 each year from 1986 to 1998. (Tr. 164). In 1998, she earned her GED. (Tr. 42). She earned between $11,113.36 and $24,543.13 each year from 1999 to

2003. (Tr. 164). She earned $1,763.74 in 2004, $713.43 in 2005, nothing in 2006, $432.21 in 2007, and nothing thereafter. (Tr. 164). Plaintiff later reported that at each of her jobs, she had "a lot of physical pain…couldn't handle people, and couldn't stay focused." (Tr. 198). She explained that she stopped working because of "emotional [problems] and drug use." (Tr. 200). Plaintiff earned enough income to be insured[2] through March 31, 2009. (Tr. 163). Plaintiff currently receives SSI based on the subsequent ALJ finding that she was entitled to disability as of October 18, 2010. (Tr. 643-53). Consequently, this case determines her eligibility for SSI and DIB during the relevant period, along with her eligibility for DIB from October 18, 2010 to the present.[3]

Plaintiff had a long history of mental health and substance abuse treatment, with "many [suicide] attempts since she was a teen," multiple inpatient substance abuse programs, and "several [psychiatric hospitalization] placements as a teen." (Tr. 228). She began a period of sobriety on June 1, 2008. (Tr. 228). However, she was incarcerated for a parole violation from previous charges. (Tr. 228). On August 4, 2008,[4] psychiatric

---

[2] Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." See 20 C.F.R. §§ 404.130-134.

[3] Monthly DIB payments typically exceed monthly SSI payments. *See* 20 C.F.R. § 404.204.

[4] Plaintiff asserts that this treatment record is from March 9, 2009. However, March 9, 2009 appears to be the date that Lancaster County Jail printed the records. (Tr. 227-28). A medication change dated November 14, 2008 also has the date March 9, 2009 at the bottom of the page. (Tr. 229). There is no evidence in the record that Plaintiff was incarcerated in March of 2009 at the Lancaster County Jail. Doc. 10.

examination at Lancaster County Jail indicated agitated and restless manner, pressured speech, anxious mood, labile affect, poor sleep and appetite, abnormal thought process with loose associations, impulsive judgment, and impaired memory. (Tr. 227). The District Court Remand Order explains that "[l]oose associations is a term for a thought disorder where several subjects  or ideas are raised by the patient with loosely apparent or no apparent logical connection." At *27-28. She had multiple symptoms of depression, including relationship impairment, difficulty functioning at work, impaired sleep, emotional agitation, crying/tearfulness, anger, impaired concentration, memory impairment, mental confusion, and anxiety. (Tr. 227).  She reported that she had been drug and alcohol free for two months. (Tr. 228). She was treated with lithium while incarcerated. (Tr. 229).

Plaintiff alleges onset in December of 2008, when she began treating with medical providers shortly after she was released from jail. (Tr. 242). In December of 2008, Plaintiff underwent physical and mental examinations. The District Court's Remand Order notes that at Plaintiff's physical examination in December of 2008, she was "anxious and had poor insight and judgment." *Vargas v. Colvin*, 2014 U.S. Dist. LEXIS 11761 at *31 (M.D. Pa. Jan. 21, 2014).  The District Court's Remand Order notes that Plaintiff also exhibited anxious affect at her psychiatric evaluation on December 2, 2008. *Vargas*, 2014 U.S. Dist. LEXIS 11761 at *32. The December 2, 2008 treatment record notes reports of impaired sleep, appetite, functioning, energy, and concentration, along

with paranoia, daily anxiety attacks, and hallucinations. (Tr. 232). Examination indicated that she was "very shaky" and had an abnormally abundant quantity of thought. (Tr. 232). She did not have custody of her children and relied on her fiancé for transportation. (Tr. 231). She indicated that her current medication regimen included lithium, Cogentin, Celexa, Ativan, and Prolixin. (Tr. 233). She indicated that she had last used drugs and alcohol seven months earlier. (Tr. 234). She was diagnosed with mood disorder, not otherwise specified; rule out bipolar disorder; and polysubstance dependence in early remission with a global assessment of function ("GAF") of 45. (Tr. 235).

The District Court Remand Order notes that:

> On December 12, 2008, Vargas had an appointment with Robert Doe, M.D., at Water Street. Tr. 239. Dr. Doe lists Vargas's current medications as Lithium, Flexeril, Elavil, Tramadol and Celexa, and appears then to indicate that Vargas was positive for some pain, positive for significant cravings and positive for dreams of the past. Id. Dr. Doe's diagnostic assessment was that Vargas suffered from bipolar disorder, drug and alcohol dependence, and chronic pain and he prescribed the medications Celexa, Lithium, and Flexeril, and discontinued Elavil and prescribed in its place Trazodone. Id. Dr. Doe also scheduled a follow-up appointment for January 9, 2009. Id.

*Vargas*, 2014 U.S. Dist. LEXIS 11761 at *33-34. The same day, Dr. Doe opined that Plaintiff was temporarily disabled for three months, from December 12, 2009 to February 12, 2009. *Id.* The District Court Remand Order explains that "Dr. Doe's treatment notes are barely legible…[but] [w]e concluded that the treatment note and the medical assessment form were completed on the same day although the date on the treatment note is unclear." *Id.* at *34 (citing Tr. 239, 243).

On December 22, 2008, Plaintiff was admitted to the Lancaster Adult Recovery Program. (Tr. 280). She remained in that program for six weeks. *Vargas*, 2014 U.S. Dist. LEXIS 11761 at *36. The District Court Remand Order notes that, on discharge, she was recommended to pursue treatment "through a dual diagnosis facility in Maryland to address both her mental health issues and her drug and alcohol addiction" after her six week hospitalization. *Vargas*, 2014 U.S. Dist. LEXIS 11761 at *36. Her diagnoses included "Schizo-Affective Disorder, Bipolar Type by history…Posttraumatic Stress Disorder…Pain Disorder Associated with Physical and Mental Factors; Organic Mood Disorder, Mixed, secondary to [organic brain disease/mild traumatic brain injury]" and borderline personality disorder. (Tr. 280). She reported problems sleeping, decreased appetite, feeling hopeless, helpless, and depressed, having death wishes a few days earlier, "a lot of panic attacks with [shortness of breath], palpitations, hyperventilation, shaking," auditory hallucinations, visual hallucinations, nightmares, and flashbacks to abuse that she suffered as a child. (Tr. 285). Her GAF was 35 on admission and 40 on discharge. (Tr. 280).

On January 22, 2009, Plaintiff presented to Dr. Shefali Shah, M.D. Primary Care "with numerous concerns." (Tr. 313). On examination, she "seem[ed] to be rocking back and forth in the chair." (Tr. 313). Dr. Shah "order[ed] an MRI for her cognitive impairment." (Tr. 313). On February 6, 2009, Plaintiff followed-up with Dr. Shah. (Tr. 315). MRI indicated "mucosal thickening" but "no abnormality of the brain." (Tr. 275).

On January 29, 2009, Plaintiff had a face-to-face interview with a state agency employee. (Tr. 174). The employee noted no problems with hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using her hands, or writing, and observed that "[c]laimant's behavior, appearance, and grooming were acceptable." (Tr. 173).

In March of 2009, Plaintiff and her fiancé completed function reports. (Tr. 175-90). She reported "no problem with personal care," and that her "illness, injuries, or conditions" did not "affect [her] ability to" dress, bathe, care for her hair, shave, feed herself, or use the toilet. (Tr. 184). She reported taking care of her fiancé, making meals, cleaning, and doing laundry for him. (Tr. 184). She reported needing reminders to care for herself or take medicine. (Tr. 185). She reported preparing meals for herself "daily," and "sometimes it takes [a] normal [amount of] time." (Tr. 185). She reported being able to perform household chores, specifically, laundry, dishes, vacuuming, dusting, and organizing her personal things in a "normal" amount of time, although she "sometime[s] becomes distracted." (Tr. 185). She indicated that she left the house daily, could leave the house alone, and would walk, ride in a car, and use public transportation, but did not drive because her license was suspended. (Tr. 186). She reported shopping for food, clothing, and household goods "on a regular basis." (Tr. 186). She reported being able to pay bills, count change, handle a savings account, and use a checkbook/money orders. (Tr. 186). She reported that she interacted with others "every day" and that she would

"talk, laugh, [and] communicate" with them. (Tr. 187). She reported some problems with attention, but reported that she could finish what she started and followed written and spoken instructions well. (Tr. 188). She reported that she does not handle stress well and was "ok" at handling changes in routine. (Tr. 189). Her fiancé reported similar activities, but emphasized that she lacked focus, performed them slowly, and needed verbal cues to complete them. (Tr. 176-78). He explained that she seemed to be able to adapt "rather easily" to changes in routine. (Tr. 181).

Treatment notes from April and May of 2009 indicate that Plaintiff continued reporting subjective symptoms, such as "feel[ing] really shaky" and "tired all the time," excessive weight gain, hallucinations, and "mood fluctuations on an hourly basis." (Tr. 291, 318). Urine testing was negative for all controlled substances. (Tr. 342).

As the District Court's Remand Order notes:

On June 22, 2009, Vargas was evaluated by Barry B. Hart, Ph.D., a psychiatrist, on behalf of the Bureau of Disability Determination. Tr. 351-358. After conducting a clinical interview and a mental status examination, Dr. Hart concluded that Vargas suffered from Schizoaffective Disorder, history of polysubstance abuse, sustained full remission, and borderline personality disorder. Tr. 355. Dr. Hart could not rule out the possibility that Vargas suffered from posttraumatic stress disorder. Id. Earlier in his report he stated that Vargas "has a long history of mental health problems apparently dating from the time that she was sexually abused by her uncle and father at eight years of age" and after her mother left when she was young "she ran away from home repeatedly for up to a year at a time." Tr. 352. Dr. Hart gave Vargas a GAF score of 60 and in the concluding paragraph of his report stated that Vargas's "concentration may well be an impediment to her ability to hold down a job at the present time." Tr. 356. In a separate document completed the same day regarding Vargas's work-related mental functioning, Dr. Hart stated that Vargas was markedly limited

in her ability to (1) make judgments on simple work-related decisions; (2) interact appropriately with the public, supervisors, and co-workers; and (3) respond appropriately to work pressures in a usual work setting and to changes in a routine work setting. Tr. 357.

*Vargas*, 2014 U.S. Dist. LEXIS 11761 at *38. This treatment record also indicates that Plaintiff's "hair was somewhat disheveled" as she had "been neglecting her hygiene due to her depressed mood." (Tr. 351). She was "reasonably self-sufficient" but did "no cooking…her partner assists with shopping…[and] she does no cleaning of the house." (Tr. 351). "[H]er partner look[ed] after their finances" and "pays the bills." (Tr. 355). She explained that she had been unable to continue with psychiatric care since February of 2009 because she could not find a psychiatrist "who takes her insurance." (Tr. 352). She had "a number of signs and symptoms of a borderline personality disorder." (Tr. 352). She was "not using any substances." (Tr. 353). Examination indicated that her "mood [was] quite labile," she "was unable to provide an explanation to a simple proverb," and her "concentration was somewhat impaired and she was unable to do serial 7's due to poor math skills…could only recall one of her last two meals." (Tr. 354).

On July 8, 2009, Plaintiff reported to Dr. Shah that she was "off drugs now for the past 18 months." (Tr. 393).

On July 15, 2009, Dr. Mitchell Sadar, Ph.D., reviewed Plaintiff's file and authored a medical opinion. (Tr. 360). He opined that she had no more than moderate limitation in work-related function. (Tr. 359-60). He opined that she had mild restriction of activities of daily living and moderate difficulties in maintaining social functioning and

concentration, persistence, or pace. (Tr. 373). Dr. Sadar indicated that Plaintiff had "no recent hospitalizations because of her mental impairment." (Tr. 361). He opined that the only medically determinable mental impairments were mood disorder, not otherwise specified, and polysubstance abuse in remission. (Tr. 361). He indicated that Plaintiff was only "partially credible." (Tr. 361). He explained that her "basic memory processes are intact." (Tr. 361). He indicated that her activities of daily living and social skills were "functional." (Tr. 361).

On August 27, 2009, she had a psychiatric evaluation with Dr. Leo Dorozynsky, M.D. (Tr. 404-08). She exhibited anxious mood and labile affect. (Tr. 406). She reported auditory hallucinations. (Tr. 407). Dr. Dorozynsky diagnosed her with mood disorder, not otherwise specified, rule out bipolar disorder, not otherwise specified, history of polysubstance abuse, in remission, and rule out personality disorder, not otherwise specified and assessed a GAF of 45. (Tr. 407).

At some point thereafter, she began using cocaine and alcohol again. (Tr. 412). At a psychiatric follow-up on September 4, 2009, her mood was anxious "by report" and her affect was appropriate. (Tr. 403). She "see[ing] bugs" occasionally. (Tr. 403). On September 29, 2009, she reported a fifty pound weight gain over the summer, which she attributed to lithium. (Tr. 410). She reported fatigue, anxiety, and depression. (Tr. 410).

Treatment notes indicate that she was "hospitalized at LGH psychiatry last week,[5] and they are adjusting her medications." (Tr. 410).

On October 7, 2009, Plaintiff presented to Lancaster General Hospital "reporting suicidal ideation with thoughts of cutting her wrists." (Tr. 412). Biopsychosocial evaluation indicated:

> [P]atient reports that she had been clean from cocaine and heroin for 18 months. She relapsed on alcohol two months ago and used cocaine twice in the last week. The patient's on probation and attending outpatient drug and alcohol treatment…was afraid that she would be violated and returned to prison, therefore took an overdose impulsively. The patient reports that she has been having depression for several months, even prior to her the relapse, but admits that, along with the relapse, her depression worsened.

(Tr. 412). She was diagnosed with mood disorder, not otherwise specified, and assessed a GAF of 40. (Tr. 415). On examination, she had depressed mood, blunted and irritable affect, and poor insight and judgment. (Tr. 415). Urine toxicology was positive for cocaine. (Tr. 417).  She was discharged five days later with a GAF of 50. (Tr. 416).

On October 22, 2009, after Plaintiff's medication was adjusted at the hospital, she followed-up with Dr. Shah, and reported with "[e]motionally, she feels pretty good" without "any depression." (Tr. 418).

On November 5, 2009, Dr. Dorozynsky explained in a letter to Plaintiff's counsel that Plaintiff "has difficulty with basic instructions…presents as fairly easily offended and seems to have some difficulty with comprehension, attention, and concentration."

---

[5] The transcript does not contain any evidence of hospitalization in September of 2009. Doc. 10.

(Tr. 408). He noted her "episodes of deterioration requiring hospitalization." (Tr. 408). However, he wrote that "I do not have specific knowledge regarding her daily functioning outside of the hospital and clinic setting" and that Plaintiff should provide "a history at working and social relationships outside of the clinical environment and her history of functioning in this area." (Tr. 408-09).

Plaintiff treated monthly with Dr. Dorozynsky from November of 2009 to May of 2010. (Tr. 486-99). Plaintiff's only diagnosis at each visit was "296.90," which is defined as mood disorder, not otherwise specified. (Tr. 486-99); American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision, p.861. On November 5, 2009, Plaintiff was "doing well" and "improved," although she reported weight gain. (Tr. 499). She was again noted to be "improved." (Tr. 497). Dr. Dorozynsky reduced her Seroquel and trazodone. (Tr. 497). Plaintiff subsequently reported that the lower dose of Seroquel was not working "as well as it had been before," and Dr. Dorozynsky increased her medication. (Tr. 491, 507). On February 26, 2010, Plaintiff again reported that she was "doing well," and Dr. Dorozynsky noted that she was "improved." (Tr. 491). At every visit except March 31, 2010, no abnormalities are noted on mental status examination, as she was calm, cooperative, well-kempt, exhibited normal speech form and content, euthymic or neutral mood, appropriate affect, normal attention and concentration, and goal directed thought-process. (Tr. 488, 490, 492, 494, 496, 498).  On March 31, 2010, Dr. Dorozynsky noted that Plaintiff had

"slipped one time" and increased her Seroquel and lithium. (Tr. 488-89). Plaintiff later testified that, at some point during her treatment with Dr. Dorozynsky, she relapsed on one day, and Dr. Dorozynsky responded by increasing her Seroquel and lithium. (Tr. 59-60). At every visit, she denied paranoia, flashbacks, obsessions, delusions, compulsions, phobias, and suicidal ideation. (Tr. 488, 490, 492, 494, 496, 498). In November of 2009, she reported hallucinations, but by December 4, 2009, she denied hallucinations, and denied hallucinations at every visit thereafter.  (Tr. 488, 490, 492, 494, 496, 498).

On February 18, 2010, Plaintiff received treatment for skin problems. (Tr. 420). Her mood, affect, speech and behavior were "normal." (Tr. 421). On February 22, 2010, Plaintiff reported that physical aches and pains were not making her "quite happy" but that she was not undergoing counseling and was "not seeking any specific counseling at this point." (Tr. 422). She was "sleeping ok." (Tr. 422). On March 10, 2010, providers observed that she was "pleasant, talkative, in no acute distress." (Tr. 423). On March 23, 2010, Plaintiff reported "many years of increasing problems with sleep." (Tr. 424). She was "pleasant but anxious." (Tr. 425).

On April 19, 2010, Plaintiff reported to her gastroenterologist that "she is doing much better since the doses of some of her medicines were adjusted. Her mood has been very good." (Tr. 506). Plaintiff was observed to be "very pleasant." (Tr. 506). Shortly thereafter, Dr. Dorzynsky cleared Plaintiff from a psychiatric perspective to begin interferon therapy for Hepatitis C. (Tr. 506). On April 29, 2010, Plaintiff was discharged

from the sleep center after a sleep study was normal. (Tr. 429). On April 26, 2010, Plaintiff reported multiple physical impairments. (Tr. 427). She "really wants a narcotic pain relief" and "does not want [physical therapy]." (Tr. 427). Plaintiff's depression was listed as "well controlled over all." (Tr. 427).

There is no evidence of any treatment from May of 2010 through November of 2012. Doc. 10. Evidence submitted after the ALJ decision indicates that Plaintiff began attending counseling at another location in November of 2012. (Tr. 769).

On July 19, 2010, Plaintiff appeared and testified at a hearing before the ALJ. (Tr. 31). She testified that she had a license, but did not drive because it was dangerous due to medication side effects. (Tr. 42). She testified that she had not told her medical providers about her problems driving. (Tr. 42). She testified to a history of abuse and mental health problems in her teens. (Tr. 42-46). She testified to pain and problems sitting, standing, walking, and lifting. (Tr. 51). She testified that she took her medications "every day like clockwork." (Tr. 52). She testified that she lived with her fiancé and he handled household chores and finances. (Tr. 53). She testified that she cried often and constantly worries. (Tr. 54). She testified that she was continuing to experience auditory and visual hallucinations. (Tr. 56). She testified to flashbacks and problems sleeping. (Tr. 57). She testified that she only showered once a week and wore the same clothes for up to four days at a time. (Tr. 58-59). She testified that she had friends in her recovery program and that she felt "better" after trying to stay off drugs. (Tr. 62). She testified that she had

"plenty" of people to call in a crisis. (Tr. 62). She testified that she was too tired to engage in her hobbies. (Tr. 63). She testified that she was unable to work because of physical pain and an inability to concentrate. (Tr. 64). She testified that she had been convicted of a felony for writing a check that did not belong to her and trying to cash it. (Tr. 67). When asked whether her doctors had opined that she was disabled, she testified that Dr. Doe "had [her] on temporary disability" and Dr. Dorozynsky "never said anything." (Tr. 69).

On September 21, 2010, the ALJ found that Plaintiff suffered medically determinable impairments of status/post spinal surgery, hepatitis C infection, mood disorder NOS and poly-substance abuse. (Tr. 19). The ALJ found that Plaintiff was disabled when she was using substances, but retained the ability to perform a range of simple, sedentary work when she stopped using substances. (Tr. 20-22). Consequently, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 13-30).

On October 18, 2010, Plaintiff filed a subsequent application for benefits. (Tr. 643-55). On October 24, 2012, an ALJ found that Plaintiff was entitled to benefits for physical impairments, and did not address Plaintiff's mental impairments. (Tr. 643-53). Consequently, that decision is of limited probative value to this appeal, which primarily concerns Plaintiff's mental complaints. (Pl. Brief).

On January 21, 2014, the District Court remanded Plaintiff's case to the ALJ. *See Vargas v. Colvin*, 2014 U.S. Dist. LEXIS 11761 (M.D. Pa. Jan. 21, 2014).  The remand

order noted that "[b]ecause the administrative law judge found that Vargas was disabled at step 3, the administrative law judge was required to follow the procedure set forth in 20 C.F.R. §§ 404.1535 and 416.935 referred to earlier in this memorandum" and "had to determine which of Vargas's psychiatric and physical conditions remained after Vargas stopped using drugs/alcohol and then determine whether those remaining conditions were disabling." *Id.* at *48. The Remand Order notes that Plaintiff "was diagnosed by treating physicians with schizophrenia, anxiety, obsessive compulsive disorder, schizoaffective disorder, posttraumatic stress disorder, an organic mood disorder, and borderline personality disorder… obesity, fibromyalgia and gastroesophageal reflux disease." *Id.* at 48-49. The ALJ failed "to find the above conditions as medically determinable impairments, or give an adequate explanation for discounting them." *Id.* at *49. The Remand Order explains that the ALJ's materiality finding and findings at subsequent steps was defective because "all medically determinable impairments, severe and non-severe" must be considered at step three. *Id.* at *49. The District Court Remand Order does not instruct the ALJ to obtain additional medical expert evidence. *Id.*

On March 19, 2014, the Appeals Council entered a remand order instructing the ALJ to "consider the additional evidence submitted with the subsequent file and obtain evidence, if available, from a medical expert to assist in clarifying the severity of the claimant's mental impairment and address the issue of onset of disability prior to October

18, 2010, in accordance with Social Security Ruling 83-20" ("Appeals Council Remand Order"). (Tr. 687).

On July 28, 2014, the ALJ held a supplemental hearing. (Tr. 585). Plaintiff testified that she performed household chores and shopping with her fiancé, and had no hobbies. (Tr. 594-95). She testified to problems sitting, standing, and walking. (Tr. 598). She testified that medications during the relevant period made her sleepy. (Tr. 600, 602). She testified that she suffered anxiety and poor concentration and focus during 2009 and 2010. (Tr. 603). She also testified that, "[b]ack then, I was able to speak and socialize with people." (Tr. 604). She testified that she was unable to work in 2009 and 2010 because of "problems thinking." (Tr. 606). She denied having flashbacks in 2009 and 2010. (Tr. 606). She denied using drugs and alcohol at any point in 2009 or 2010. (Tr. 608-09).

On October 8, 2014, the ALJ issued the decision. (Tr. 584). At step two, the ALJ found that Plaintiff's lumbar disc disease, status post an L5-S1 fusion, status post hardware removal, low back pain, chronic pain, fibromyalgia, rheumatoid arthritis, chronic shoulder pain, hepatitis C, obesity, a mood disorder, a bipolar disorder, depression, a substance induced mood disorder, schizophrenia, anxiety, an obsessive compulsive disorder, polysubstance addiction, a borderline personality disorder, cocaine abuse, marijuana abuse and alcohol abuse were medically determinable and severe. (Tr. 572). The ALJ found that Plaintiff's asthma, tobacco use disorder, pneumonia, upper

respiratory infection, gastroesophageal reflux disease, constipation, right elbow injury, skin impairments, chest pain, and sleep disorder were medically determinable but non-severe. (Tr. 572-73).  At step three, the ALJ found that Plaintiff did not meet or equal a Listing when she was sober. (Tr. 575). The ALJ found that Plaintiff had the RFC to perform a range of sedentary, unskilled work when she was sober. (Tr. 577-78). At step four, the ALJ found that Plaintiff could not perform past relevant work. (Tr. 582). At step five, the ALJ relied on the vocational expert testimony and found that Plaintiff could perform work in the national economy when she was sober. (Tr. 582). Accordingly, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 584).

## VI.    Plaintiff Allegations of Error

### A.    Remand Order

Plaintiff asserts that the ALJ erred by failing to follow the Appeals Council Remand Order, which instructed the ALJ to obtain a medical expert in compliance with SSR 83-20. The Appeals Council Remand Order states that it was implementing the District Court Remand Order. (Tr. 687-88).   However, the Appeals Council Remand Order does not parallel the District Court Remand Order. The District Court Remand Order required the ALJ to address all medically determinable impairments. *Vargas v. Colvin*, 2014 U.S. Dist. LEXIS 11761 at *31 (M.D. Pa. Jan. 21, 2014).   The District Court Remand Order does not require reevaluation of Plaintiff's onset date or instruct the ALJ to obtain additional medical expert evidence. *Id.* The Appeals Council Remand

Order instructs the ALJ to obtain medical expert evidence regarding onset pursuant to SSR 83-20, but SSR 83-20 does not apply when there are medical records contemporaneous to the alleged onset. *See* SSR 83-20.  SSR 83-20 applies when "the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination," requiring inferences from non-contemporaneous medical evidence. *Id.*

The District Court instructed the ALJ to consider Plaintiff's diagnoses of "schizophrenia, anxiety, obsessive compulsive disorder, schizoaffective disorder, posttraumatic stress disorder, an organic mood disorder, and borderline personality disorder… obesity, fibromyalgia and gastroesophageal reflux disease." *Vargas v. Colvin*, 2014 U.S. Dist. LEXIS 11761 at *48-49 (M.D. Pa. Jan. 21, 2014).   The ALJ acknowledged some of these diagnoses, and either found them severe at step two or explained why she found them to be non-severe. (Tr. 572-74). The ALJ did not acknowledge Plaintiff's schizoaffective disorder, posttraumatic stress disorder, or organic mood disorder. (Tr. 572-74). However, Plaintiff has not asserted any error at step two and has not alleged that these impairments should have been considered at subsequent steps. (Pl. Brief); (Pl. Reply). These diagnoses were not noted in the record after October of 2009. (Tr. 486-99). Consequently, the Court concludes that the ALJ functionally complied with both Remand Orders and does not recommend remand on this ground.

## B.    Medical Opinions

Plaintiff asserts that the ALJ erred in weighing the medical opinions. (Pl. Brief at 17-18). "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). Opinions can come from various sources, including treating physicians, examining physicians, and non-examining physicians. 20 C.F.R. §§ 404.1527(c)(1)-(2). Section 404.1527(c)(1) provides that, "[g]enerally, [the Commissioner] give[s] more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." *Id.*

Pursuant to 20 C.F.R. §404.1527(c)(3), "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion" and "[t]he better an explanation a source provides for an opinion, the more weight we will give that opinion." Pursuant to 20 C.F.R. §404.1527(c)(4), "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." Pursuant to 20 C.F.R. §404.1527(c)(5), more weight may be assigned to specialists, and 20 C.F.R. §404.1527(c)(6) allows consideration of other factors which "tend to support or contradict the opinion."

A non-examining opinion may be assigned more weight than an examining opinion. *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) (Non-examining consultants are "highly qualified…medical specialists who are also experts in Social Security disability evaluation."). As the Third Circuit explained in *Jones v. Sullivan*, 954 F.2d 125 (3d Cir. 1991):

> After Jones applied for reconsideration of the initial rejection of his claim, two physicians in the state agency evaluated the medical findings of Jones's treating physicians and concluded that those findings did not reveal any condition that would preclude gainful employment. In light of such conflicting and internally contradictory evidence, the ALJ correctly determined that the opinions of Jones's treating physicians were not controlling. *See, e.g.*, *Wright v. Sullivan*, 900 F.2d 675, 683 (3d Cir.1990); *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir.1985).

*Id*. at 128-29. *See also Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000) (An ALJ "may choose whom to credit" when opinions conflict) (quoting *Plummer*, 186 F.3d at 429); *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("Although treating and examining physician opinions often deserve more weight than the opinions of doctors who review records, see, e.g., 20 C.F.R. § 404.1527(d)(1)-(2), '[t]he law is clear ... that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity'") (quoting *Brown v. Astrue*, 649 F.3d 193, 197 n. 2 (3d Cir.2011)).

Plaintiff asserts that the ALJ erred in assigning little weight to Dr. Doe's opinion that Plaintiff was disabled for three months. (Pl. Brief at 17-18). Plaintiff must establish disability for twelve months. *See* 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). Any error in assigning weight to Dr. Doe's opinion was harmless, because it does not

support Plaintiff's claim for disability. *See Rutherford v. Barnhart*, 399 F.3d 546, 552-53

(3d Cir. 2005) (remand is not required when it would not affect the outcome of the case).

Dr. Doe opined that Plaintiff's disability ended in February of 2009. *Supra.* No treating

source medical opinion supports Plaintiff's claim that she is disabled under the Act.

Plaintiff asserts that the ALJ erred in rejecting Dr. Hart's opinion because "1) Dr.

Hart is a non-treating source who examined the claimant on only one occasion; and 2)

His opinion is inconsistent with the clinical and objective findings. (R. at 581)." (Pl. Brief

at 20).  Plaintiff asserts that the ALJ's explanation is "inadequate and vague" and only

"pointed out few isolated instances regarding Vargas' improvement." (Pl. Brief at 20).

The ALJ wrote that:

> Indeed, a mental status evaluation in September 2009 by Dr. Dorozynsky
> revealed the claimant to be cooperative with normal speech form and content
> (Exhibit 14F). Likewise, a mental status evaluation in May 2010 by Dr.
> Dorozynsky revealed the claimant's attention and concentration to be within
> normal limits with goal directed thought processes, a euthymic mood and a
> broad and appropriate affect (Exhibit 17F). The Administrative Law Judge
> also notes that the claimant reported on a Function Report in March 2009
> that she had no problems getting along with others, including family, friends
> and neighbors and that she spent time with others on a daily basis (Exhibit
> 3E). Accordingly, the undersigned affords little weight to the opinion of Dr.
> Hart (Exhibit 3E).

(Tr. 581).

This is an accurate characterization of the record. Dr. Hart's opinion is inconsistent

with Plaintiff's normal medical reports after September of 2009 and Plaintiff's March

2009 Function Report. *Supra*. An ALJ is authorized to rely on whether Dr. Hart's opinion

is consistent with the record. *See* 20 C.F.R. §404.15127(c). In contrast, Dr. Sadar had the opportunity to review Plaintiff's March 2009 Function Report. (Tr. 361). He accurately characterized this report as showing that her activities of daily living and social skills were intact. (Tr. 175-90). . Moreover, as the ALJ wrote:

> Although the State Agency psychological consultant did not examine the claimant, he provided specific reasons for his opinions about the severity of the claimant's condition showing that his opinion was grounded in the evidence of record, including careful consideration of the objective medical evidence and the claimant's allegations regarding symptoms and limitations."

(Tr. 581). Consequently, the ALJ also concluded that Dr. Sadar's opinion was better supported, which is also an acceptable factor to consider in weighing the medical opinions. *See* 20 C.F.R. §404.1527(c).

Plaintiff asserts that a non-treating, non-examining opinion is "entitled to little, if any weight." (Pl. Brief at 21). Plaintiff asserts that "State agency opinions cannot provide substantial evidence to rebut the contrary opinion of a treating physician." (Pl. Brief at 21). Plaintiff does not cite to any law for these assertions. (Pl. Brief at 21). Plaintiff asserts that "[a]ccording to SSR 96-6p, a State Agency opinion can be given greater consideration than a treating source only under special circumstances." (Pl. Brief at 21). However, SSR 96-6p merely provides illustrations of when it would be appropriate to give a state agency opinion greater consideration. *See* SSR 96-6p.  SSR 96-6p is not an exhaustive list of all possible situations when a state agency may be entitled to greater consideration. *Id.* Regardless, as discussed above, no treating source medical opinion

supported Plaintiff's claim. The ALJ properly credited the non-examining state agency opinion over the examining opinion, and properly relied on this opinion to conclude that Plaintiff was not disabled during periods of sobriety. (Tr. 587). The Court does not recommend remand on these grounds.

Even if the ALJ erred in crediting Dr. Sadar's opinion over Dr. Hart's opinion, that error would be harmless. *See Rutherford v. Barnhart*, 399 F.3d 546, 552-53 (3d Cir. 2005) (remand is not required when it would not affect the outcome of the case). There is no medical opinion that Plaintiff's symptoms during her second period of sobriety, which began only ten months after her alleged onset date, were disabling. Doc. 10. As will be discussed below, the dearth of objective findings and reported symptoms after Plaintiff attained sobriety in October of 2009 provides substantial evidence to the ALJ's decision that she was not disabled when she was sober after October of 2009, so Plaintiff cannot establish disability for the requisite twelve month duration. 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A).

### C.   Materiality of cocaine and alcohol abuse

Plaintiff asserts that the ALJ erred in evaluating Plaintiff's substance abuse. If drug addiction or alcoholism ("DAA") exacerbates a claimant's mental or physical limitations, the ALJ must determine "whether we would still find you disabled if you stopped using drugs or alcohol." 20 C.F.R. § 404.1535(b). If a claimant would not be disabled during sobriety, then the claimant is not entitled to benefits under the Act. *Id.*

Plaintiff asserts that, "[i]n cases where substance abuse is an issue, an ALJ must identify at least some medical evidence supporting the conclusion that a claimant no longer would be disabled if he or she stopped drinking or taking drugs." (Pl. Brief at 13) (citing *Sklenar v. Barnhart*, 195 F. Supp.2d 696, 700 (W.D. Pa. 2002)).   Plaintiff asserts that because no medical provider found that Plaintiff's substance abuse was material, the finding was "not based on substantial evidence." (Pl. Brief at 16).   Plaintiff does not cite any binding precedent that requires a medical expert to find that her substance abuse was material. (Pl. Brief at 14-16). Plaintiff also asserts that "the ALJ improperly ignored the evidence of record." (Pl. Brief at 14). The Court explained in *Voorhees v. Colvin*, No. 3:13-CV-02583-GBC, 2015 WL 5785830, at *25 (M.D. Pa. Sept. 30, 2015):

> Section 105 of the Contract With America Advancement Act of 1996 ("CWAAA") amended the Social Security Act to provide that "an individual shall not be considered to be disabled" thereunder if "alcoholism or drug addiction" would be "a contributing factor material to the Commissioner's determination that the individual is disabled." Pub.L. No. 104–121, § 105; 110 Stat. 847, 852–853 (1996); 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J); 20 C.F.R. § 416.935(a); *accord Thornhill v. Colvin,* No. CIV.A. 13–530, 2014 WL 1328153, at *3 (W.D. Pa. Apr. 2, 2014). The SSA has published policy interpretation rulings, the latest version of which is SSR 13–2p, 78 Fed.Reg. 11939 (Feb. 20, 2013), setting forth the process to be followed in conducting a DAA materiality inquiry. Further, the SSA has provided guidance on the considerations for a DAA materiality inquiry through its Program Operations Manual System. *See* POMS § 90070.050.

*Id*. at *25. The Court continued:

> Although an ALJ may make a materiality finding without "expert psychiatric opinion evidence," "[w]hen it is not possible to separate the mental restrictions and limitations imposed by DAA [drug and alcohol addiction] and the various other mental disorders shown by the evidence, a

finding of 'not material' would be appropriate." *McGill v. Comm'r of Soc. Sec.,* 288 F. App'x 50, 52–53 (3d Cir.2008) (unpublished) (quoting EM–96200).

*Id.* at \*26. Thus, the Court must determine whether it is "possible to separate" the symptoms caused by Plaintiff's substance abuse from the symptoms caused by Plaintiff's other impairments. *Id.*

There is no evidence in the record that Plaintiff was using drugs or alcohol during this from December 12, 2008 to approximately August of 2009 time. (Tr. 342). During this period, Plaintiff reported impaired sleep, appetite, functioning, energy, and concentration, along with paranoia, daily anxiety attacks, and hallucinations (Tr. 232); cravings and dreams of the past (Tr. 239); problems sleeping, decreased appetite, feeling hopeless, helpless, and depressed, having death wishes a few days earlier, "a lot of panic attacks with [shortness of breath], palpitations, hyperventilation, shaking," auditory hallucinations, visual hallucinations, nightmares, and flashbacks to abuse that she suffered as a child (Tr. 285); "feel[ing] really shaky" and "tired all the time" with continued excessive weight gain, hallucinations, and "mood fluctuations on an hourly basis" (Tr. 291, 318); and "depression for several months, even prior to her the relapse." (Tr. 412). Objective mental status examinations during this period indicated anxiety, poor insight and judgment, (Tr. 242), anxious affect, shakiness, and an abnormally abundant quantity of thought (Tr. 232), "rocking back and forth in the chair" (Tr. 313); Plaintiff's "hair was somewhat disheveled" as she had "been neglecting her hygiene due to her

depressed mood," "a number of signs and symptoms of a borderline personality disorder," her "mood [was] quite labile," she "was unable to provide an explanation to a simple proverb," and her "concentration was somewhat impaired and she was unable to do serial 7's due to poor math skills…could only recall one of her last two meals" (Tr. 351-52, 354); and anxious mood and labile affect. (Tr. 406). Plaintiff's diagnoses from various mental health providers during this time included bipolar disorder and drug and alcohol dependence (Tr. 239); "Schizo-Affective Disorder, Bipolar Type by history…Posttraumatic Stress Disorder…Pain Disorder Associated with Physical and Mental Factors; Organic Mood Disorder, Mixed, secondary to [organic brain disease/mild traumatic brain injury]" and borderline personality disorder (Tr. 280); schizoaffective disorder, history of polysubstance abuse, sustained full remission, borderline personality disorder, and rule out PTSD (Tr. 355). However, the Court notes that Dr. Sadar's opinion evaluated the record during this time, and concluded that she was not suffering disabling impairments. *Supra.*

Regardless, the ALJ did not err with regard to Plaintiff's sobriety after her August 2009 to October 2009 relapse. By October of 2009, she reported "[e]motionally, she feels pretty good" without "any depression." (Tr. 418). Plaintiff's only psychiatric treatment after October 2009 were monthly medication visits with Dr. Dorozynsky. At every visit

except March 31, 2010,[6] no abnormalities are noted on mental status examination, as she was calm, cooperative, well-kempt, exhibited normal speech form and content, euthymic or neutral mood, appropriate affect, normal attention and concentration, and goal directed thought-process. (Tr. 488, 490, 492, 494, 496, 498). Plaintiff's diagnoses only included mood disorder, not otherwise specified, and no longer included rule out bipolar disorder, or rule out personality disorder. (Tr. 407). At every visit, including during her short relapse, she denied paranoia, flashbacks, obsessions, delusions, compulsions, phobias, and suicidal ideation. (Tr. 488, 490, 492, 494, 496, 498). In November of 2009, she reported hallucinations, but by December 4, 2009, she denied hallucinations, and denied hallucinations at every visit thereafter.  (Tr. 488, 490, 492, 494, 496, 498). Providers who treated her for physical ailments observed her mood, affect, speech and behavior were "normal." (Tr. 421). On April 19, 2010, Plaintiff reported to her gastroenterologist that "she is doing much better since the doses of some of her medicines were adjusted. Her mood has been very good." (Tr. 506). Plaintiff was observed to be "very pleasant." (Tr. 506). Shortly thereafter, Dr. Dorzynsky cleared Plaintiff from a psychiatric perspective to

---

[6] On March 31, 2010, Dr. Dorozynsky noted that Plaintiff had "slipped one time" and increased her Seroquel and lithium. (Tr. 488-89). Plaintiff later testified that, at some point during her treatment with Dr. Dorozynsky, she relapsed on one day, and Dr. Dorozynsky responded by increasing her Seroquel and lithium. (Tr. 59-60). Consequently, it appears that the only evidence of objective abnormalities occurred during a short relapse. (Tr. 59-60, 488-89).

begin interferon therapy[7] for Hepatitis C. (Tr. 506). Plaintiff produced no evidence of treatment after May of 2010 through the end of the relevant period in October of 2010. Doc. 10.

Consequently, it is "possible to separate the mental restrictions and limitations imposed by DAA" for the period after October of 2009 because Plaintiff was not using drugs or alcohol after October of 2009 and demonstrated essentially no symptoms after October of 2009. *McGill v. Comm'r of Soc. Sec.*, 288 F. App'x 50, 52–53 (3d Cir.2008) (unpublished) (quoting EM–96200).

The medical evidence supports the ALJ's conclusion that Plaintiff did not suffer disabling limitations while she was suffering only from mental illness, not substance abuse, after October of 2009. Consequently, substantial evidence supports the ALJ's materiality assessment as a whole, because Plaintiff did not meet the duration requirement in the definition of disability under the Act.

### D.    Credibility

Plaintiff asserts that the ALJ erred in assessing her credibility and her fiancé's credibility. (Pl. Brief at 28-29). When making a credibility finding, "the adjudicator must

---

[7] "Increasingly, psychiatrists are asked to provide 'psychiatric clearance' for patients who are to be treated with a regimen that includes recombinant preparations of interferon-alpha…Both sustained adherence and psychosocial stability are necessary…Ideally, any preexisting mental illness should be stably managed for 6 months before starting IFN-α, although the exact length of time is a clinical judgment….Ideally, preexisting mood disorders should be in remission before IFN-α is started." Psychiatric Clearance for Patients Started on Interferon-Alpha-Based Therapies, Francis E. Lotrich, American Journal of Psychiatry 2013 170:6, 592-597.

consider whether there is an underlying medically determinable physical or mental impairment(s)…that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7P. Then:

> [T]he adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7P; *see also* 20 C.F.R. § 416.929. "Under this evaluation, a variety of factors are considered, such as: (1) 'objective medical evidence,' (2) 'daily activities,' (3) 'location, duration, frequency and intensity,' (4) medication prescribed, including its effectiveness and side effects, (5) treatment, and (6) other measures to relieve pain." *Daniello v. Colvin*, CIV. 12-1023-GMS-MPT, 2013 WL 2405442 (D. Del. June 3, 2013) (citing 20 C.F.R. § 404.1529(c)).

With regard to objective medical evidence, the ALJ wrote that "statements of the claimant and her fiancé…were not consistent with the clinical and objective" evidence. (Tr. 579). The ALJ noted that mental status examination findings from September of 2009 to May of 2010 were normal, explaining that "a mental status evaluation in May 2010 by Dr. Dorozynsky revealed the claimant's attention and concentration to be within normal limits with goal directed thought processes, an euthymic mood and a broad and appropriate affect." (Tr. 580). This is an accurate characterization of the record and an

appropriate factor to use in discounting the credibility of Plaintiff and her fiancé. An ALJ is allowed to credit normal mental status examinations over subjective complaints. *See* SSR 96-7p; *Nelson v. Astrue*, 321 Fed.Appx. 195, 197 (3d Cir. 2009) (Substantial evidence supported the ALJ decision where ALJ relied on "an essentially normal mental status examination" and a state agency opinion); *Cosmas v. Comm'r of Soc. Sec.*, 283 Fed.Appx. 976, 978 (3d Cir. 2008) (ALJ properly found only slight mental limitations where claimant demonstrated depression, but "the balance of the mental status examination was normal, since the claimant was oriented in three spheres, his speech was intact, he had good judgment and he was not suicidal."); *see also* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, §12.00(D)(1)(c)(4) ("The mental status examination is performed in the course of a clinical interview and is often partly assessed while the history is being obtained. A comprehensive mental status examination generally includes a narrative description of your appearance, behavior, and speech; thought process (e.g., loosening of associations); thought content (e.g., delusions); perceptual abnormalities (e.g., hallucinations); mood and affect (e.g., depression, mania); sensorium and cognition (e.g., orientation, recall, memory, concentration, fund of information, and intelligence); and judgment and insight. The individual case facts determine the specific areas of mental status that need to be emphasized during the examination.").

The ALJ also relied on Plaintiff's work history, writing:

The Administrative Law Judge has examined the claimant's work record and notes that the claimant has a somewhat sporadic work history with no

significant earnings after 2003 (Exhibits 3D, 4D, 5D, 6D, 7D). This factor, in addition to the other inconsistencies noted above, leads the undersigned to question the claimant's motivation to work.

(Tr. 580). It was permissible for the ALJ to consider Plaintiff's work history as a factor in determining Plaintiff's credibility. *See Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir.1979) (ALJ should consider whether claimant has a lengthy work history in evaluating credibility).

The ALJ also relied on Plaintiff's "course of treatment" and "activities of daily living." (Tr. 582). Plaintiff challenges these rationales. Plaintiff asserts that the ALJ erred by relying on Plaintiff's conservative treatment because "this unsubstantiated logic does not automatically indicate that Vargas lacks symptoms or limitations. The ALJ does not provide any support for this assertion and also glossed over findings and diagnoses that would support the severity of Vargas' physical impairments." (Pl. Brief at 29). However, the ALJ is specifically instructed to evaluate Plaintiff's course of treatment. *See* SSR 96-7p. Dr. Sadar relied on Plaintiff's lack of hospitalizations. *Supra.* After Plaintiff's medications were adjusted during her cocaine and alcohol relapse, her treatment became even more conservative, with only monthly medication management visits through May of 2010 and no evidence of care after May of 2010.[8] Doc. 10. Consequently, the ALJ properly relied on Plaintiff's treatment. *See* SSR 96-7p.

---

[8] Plaintiff did not submit proof to the Appeals Council or this Court that she did undergo any treatment after May of 2010 or argue that the ALJ failed to develop the record or that remand for new and material evidence was appropriate. (Pl. Brief); (Pl. Reply).

Sporadic and transitory activities of daily living do not establish that a claimant can perform substantial gainful activity, *see Fargnoli v. Massanari*, 247 F.3d 34, 44 (3d Cir. 2001), but may be used to show that a claimant's allegations are inconsistent. *See* SSR 96-7p ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record."); *Horodenski v. Comm'r of Soc. Sec.*, 215 F. App'x 183, 189 (3d Cir. 2007) ("Horodenski's testimony about her daily activities is not merely significant because of its substance; it was also significant because it was internally inconsistent, which aided the ALJ in determining how much weight to afford to Horodenski's testimony."). Here, the ALJ specifically wrote that "the claimant's activities of daily living were also inconsistent with the claimant's allegations."  (Tr. at 580). This is an accurate characterization of the record. Plaintiff alleged difficulty with hygiene, showering once every two weeks and wearing the same clothes for days. (Tr. 58-59). However, while the medical records indicated problems with hygiene prior to October of 2009, (Tr. 351), she was noted to be well-kempt in every record after October of 2009. (Tr. 488, 490, 492, 494, 496, 498). Similarly, she testified that she continued to experience flashbacks and hallucinations when she testified in July of 2010, but denied any flashbacks or hallucinations in every medical record after November of 2009. (Tr. 488, 490, 492, 494, 496, 498).

Regardless, even if the ALJ erred in relying on Plaintiff's activities of daily living, the ALJ properly relied on the objective medical evidence, her work history, and

conservative treatment. Plaintiff does not challenge the ALJ's reliance on the objective medical evidence or work history. (Pl. Brief); (Pl. Reply). Plaintiff asserts that the ALJ erred in assessing the third-party report of Plaintiff's fiancé because the ALJ questioned his credibility "without providing a single legitimate reason." (Pl. Brief at 29). However, as discussed above, the ALJ specifically stated that statements by Plaintiff's "fiancé…were not consistent with the clinical and objective" evidence. (Tr. 579). As discussed above, this was an accurate characterization of the record and a proper reason to find him less than fully credible. *See* SSR 96-7p.

Plaintiff's allegations boil down to an argument that the weight of the evidence supported her credibility. However, while treating physicians are entitled to deference with medical opinions, the ALJ is entitled to deference with regard to credibility determinations. *See  Szallar v. Comm'r Soc. Sec.*, No. 15-1776, 2015 WL 7445399, at *1 (3d Cir. Nov. 24, 2015) ("the ALJ's assessment of his credibility is entitled to our substantial deference") (citing *Zirnsak v. Colvin*, 777 F.3d 607, 612–13 (3d Cir.2014)). Moreover, "[n]either the district court nor this court is empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (internal citations omitted); *see also Chandler v. Comm'r of Soc. Sec.*,  667 F.3d 356, 359 (3d Cir.2011) ("Courts are not permitted to re-weigh  the evidence or impose their own factual determinations" (internal citations omitted)). A reasonable mind could accept the lack of objective evidence, conservative treatment, and

work history to conclude that Plaintiff was not fully credible. *See Richardson v. Perales*, 402 U.S. at 401 (1971).

## VII.   Conclusion

The Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552; *Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503. Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence requires "more than a mere scintilla" but is "less than a preponderance." J*esurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Here, a reasonable mind might accept the relevant evidence as adequate.    Accordingly, it is HEREBY RECOMMENDED:

I.      This appeal be DENIED, as the ALJ's decision is supported by substantial evidence; and

II.     The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.


Dated: January 14, 2016                     s/Gerald B. Cohn
                                   GERALD B. COHN
                                   UNITED STATES MAGISTRATE JUDGE